IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MICHAEL McALISTER                                                        PLAINTIFF

V.                      Civil No. 2:22-cv-02073-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                                  DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

      Plaintiff, Michael McAlister, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.    Procedural Background**

      Plaintiff filed his application for DIB on February 19, 2020, alleging disability since September 29, 2018, due to diabetes, back pain, insomnia, anxiety, depression, post-traumatic stress disorder ("PTSD"), headaches, diarrhea, kidney stones, and frequent urination. (ECF No. 8, pp. 78-79, 89, 162-168, 190, 198-199). An administrative hearing was held telephonically on January 7, 2021. (*Id*. at 38-76). Plaintiff was present and represented by counsel.

      Born in July 1971, Plaintiff was 43 years old on his alleged onset date and possessed a high school education. (ECF No. 8, pp. 162, 191). He had past relevant work ("PRW") experience as an assembler, factory worker, and forklift operator during the 15 years preceding his alleged onset date. (*Id*. at 27, 196, 204-211, 192, 200-207).

On June 2, 2021, the Administrative Law Judge ("ALJ"), Hon. Glenn Neel, determined that the Plaintiff met insured status requirements through December 31, 2023. (ECF No. 8, p. 22). The ALJ then identified Plaintiff's degenerative disc disease ("DDD") of the lumbar spine status post-surgery; diabetes mellitus with neuropathy; and obesity as severe impairments, but he concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*. at 22, 25). Despite his impairments, ALJ Neel found that Plaintiff retained the residual functional capacity ("RFC") to perform light work, with occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (*Id*. at 26). With the assistance of a vocational expert ("VE"), ALJ Neel ultimately decided the Plaintiff could perform his PRW as an assembler or, in the alternative, other jobs such as merchandise marker, routing clerk, cutter and paster, eyeglass frame polisher, and nut sorter. (*Id*. at 30-32).

The Appeals Council denied Plaintiff's request for review on March 2, 2022. (ECF No. 8, pp. 5-10). Plaintiff subsequently filed this action on April 27, 2022. (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 10, 12), and the matter is ready for Report and Recommendation.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the

record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of his RFC if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III. Discussion

Plaintiff raises three issues on appeal: (1) whether the ALJ properly found his chronic daily headaches and recurrent kidney/urinary tract stones to be non-severe impairments; (2) whether the ALJ's RFC is supported by substantial evidence; and (3), whether the Plaintiff can return to his PRW, as found by the ALJ.

### A. Non-severe Impairments

In his first issue, the Plaintiff disputes the ALJ's determination that his daily headaches, recurrent kidney/urinary tract stones, and depression/anxiety are non-severe impairments. A claimant has the burden of providing evidence of functional limitations in support of their contention of disability. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). A mere diagnosis alone is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990).

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id*. (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id*. (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)). A step two finding of a non-severe impairment does not, however, end the ALJ's duty to consider the impairment. The evidence in this case, however, fails to breach this threshold.

The record does document a history of daily headaches, dating back to at least February 2015, three years prior to the Plaintiff's alleged onset date. (ECF No. 8-1, pp. 1-6). Following a normal CT scan of his head, he and his physician opted to treat his tempomandibular joint dysfunction ("TMJ"), believing the two to be related. (ECF No. 8-1, p. 7-13, 55, 112; ECF No. 8-

2, pp. 97, 217). Dr. Sumanth Bulgari prescribed Naprosyn and Flexeril and recommended consulting a neurologist. Thereafter, the Plaintiff reported improvement in his headaches and voiced no further complaints until January 24, 2020. (ECF No. 8-1, pp. 14-19, 34-54). *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). At that time Nurse Practitioner Elizabeth Charles noted that the cause of his chronic headaches was yet to be determined. (ECF No. 8-1, pp. 281-295, 301-308; ECF No. 8-3, pp. 31-43). And yet, only three days later, she completed a medical source statement indicating that the Plaintiff's limitations were due to his headaches, among other impairments. (ECF No. 8, pp. 266-269; ECF No. 8-1, pp. 528-531).

There was no further mention of headaches until January 2021, when Dr. Bennett noted that the Plaintiff had experienced chronic headaches since a motor vehicle accident three years earlier. (*See id.*). He opined that the Plaintiff could not perform his job effectively due to the combination of his impairments and did not anticipate any improvement in his overall health. (ECF No. 8-2, p. 719; ECF No. 8-3, pp. 1-8). However, Dr. Bennett also noted that the Plaintiff had never consulted a neurologist and was only taking Ibuprofen and Tylenol.

Unfortunately, the record does not support the Plaintiff's contention that he consistently suffered from debilitating headaches throughout the relevant period. As noted by the ALJ, medical records indicate that his headaches responded well to the treatment prescribed for his TMJ, namely anti-inflammatories and a muscle relaxer. *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (internal quotation marks and citation omitted); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000) ("Impairments that are controllable or amenable to treatment do not support a

finding of total disability.") (internal quotation marks and citation omitted). In fact, he did not even take prescription medication specifically for his headaches, instead taking only over-the-courter Tylenol and Ibuprofen. *See Hepp v. Astrue*, 511 F. 3d 798, 807 (8th Cir. 2008) (holding that moderate, over-the-counter medication for pain does not support allegations of disabling pain). And, although he indicated that he was not opposed to consulting with a neurologist, he failed to do so as recommended by his medical provider. *See Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) (holding that failure to follow prescribed medical treatment without good cause is a basis for denying benefits).

The Plaintiff focuses on the ALJ's statement that he suffered from "secondary headaches disorder," contending that the cause of his headaches was irrelevant. However, the primary or secondary nature of the Plaintiff's headaches was not the basis of the ALJ's decision. Rather, the ALJ correctly focused on the absence of functional limitations for his headaches, the absence of consistent treatment for and repeated denials of headaches at examinations, and the responsiveness of his headaches to the medications prescribed to treat his TMJ.

Similarly, Plaintiff cites several instances in the record where he was diagnosed with kidney stones, contending that these episodes would result in excessive work absences that would prohibit him from maintaining employment. However, a number of these citations are to records dated prior to his alleged onset date. Emergency room records dated January 2018 indicate he was treated for a stone in the left ureter, confirmed by CT scan. (ECF No. 8-1, pp. 358-362; ECF 8-2, pp. 61-62, 181-183, 596-597). The doctor prescribed Zofran, Flomax, and Percocet.

He was next treated for a CT confirmed right renal stone and two stones in the left ureterovesical junction causing hydronephrosis and hydroureter in December 2018, some 11

6

months later.  (ECF No. 8-1, pp. 327-331; ECF No. 8-2, pp. 47-48, 167-168, 448-451).  Pain medication and Zofran were again prescribed, and the Plaintiff was referred to nephrology.

He received treatment for flank pain on only one occasion in 2019.  In March, a CT scan revealed a small non-obstructive right renal stone and two stones in the left ureterovesical junction, again resulting in hydronephrosis and hydroureter.  (ECF No. 8-1, pp. 320-324; ECF No. 8-2, pp. 42-44, 163-164, 431-432).  The emergency room doctor prescribed Norco, Flomax, and Zofran and referred him to nephrology.

In 2020, the Plaintiff was treated for kidney stones on two occasions.  On May 5, 2020, a CT scan showed two stones in the proximal right ureter with mild to moderate hydroureteronephrosis.  (ECF No. 8-2, pp. 20-21, 140-141, 339-341).  X-rays taken on May 22 indicated that the stones were resolving, as only a tiny right kidney stone remained.  (ECF No. 8-2, pp. 138, 311).

On July 3, he again reported flank pain suspicious for recurrent stone disease.   (ECF No. 8-2, pp. 11-12, 131-132, 286-287).  And a CT scan confirmed the presence of bilateral intrarenal calculi obstructing the right ureter.

In December 2020, Dr. Bennett referred the Plaintiff to nephrology for complaints of malaise, fatigue, and flank pain.  (ECF No. 8-2, pp. 239-243; ECF No. 8-3, pp. 9-15).  There is, however, no evidence in the record that the Plaintiff followed through with this referral.  *See Kelley*, 372 F.3d at 961.  There is also no evidence to suggest these episodes required hospitalization or surgical intervention.  Although very painful to endure, the record indicates that his condition was responsive to the treatment prescribed.  *See Brown*, 390 F.3d at 540.  And, given the infrequent nature of these episodes, one to two per year, we cannot say they would prevent the Plaintiff from attending work on a regular basis.

As for his mental impairments, we note that he was diagnosed with depression before his alleged onset date. Records indicate that Dr. Balguri refilled his Prozac prescription in February 2015, noting his depression to be stable. (ECF No. 8-1, pp. 1-6). And, although he continued to receive prescriptions for this medication, Dr. Balguri consistently documented normal mental status exams and indicated that his depression was well controlled. (ECF No. 8-1, pp. 14-19, 28-54, 111-115; ECF No. 8-2, pp. 84-85, 304-305, 691-692). Moreover, in July 2017, the Plaintiff advised Nurse Bennett that he had experienced some depression following the death of his father the previous year, but he admitted it was controlled with medication. (ECF No. 8-1, pp. 59-64, 120-125).

An exam conducted in September 2018 documented a flat affect, but thereafter, exams revealed a normal mood and affect. (ECF No. 8-1, pp. 68-74, 79-83, 129-135, 158-161, 246-253, 324-326, 345-349, 355-358, 362-365; ECF No. 8-2, pp. 60-61, 181, 542, 547). It was not until May 21, 2019, when the Plaintiff again complained of depression. (ECF No. 8-1, pp. 221-228, 255-265, 316-320; ECF No. 8-2, pp. 35-36, 156, 405, 414). At that time, Dr. Bennett noted a normal mental status exam and advised the Plaintiff to continue the Prozac without change.

In January 2020, Plaintiff reported to Nurse Charles that his depression had improved with Prozac. (ECF No. 8-1, pp. 281-295, 301-308; ECF No. 8-3, pp. 31-43). She noted normal speech, behavior, judgment, thought content, cognition, and memory, as well as a normal mood and affect. Inconsistently, however, she completed a mental medical source statement on January 27, 2020, assessing him with severe limitations in the ability to deal with work stresses, accepting instructions, and responding appropriately to criticism from supervisors; and marked restrictions in interacting with the general public, functioning independently, understanding and remembering detailed or complex instructions, carrying out all levels of instruction, avoiding undue constriction

of interests, responding appropriately to changes in routine work setting and work procedures, traveling in unfamiliar places or using public transport, being aware of normal hazards and taking appropriate precautions, and asking simple questions or requesting assistance. (ECF No. 8, pp. 270-273; ECF No. 8-1, pp. 523-526). She also noted the Plaintiff had difficulty following instructions and finishing tasks at work, as well as problems with anxiety, depression, and anger management.

On December 14, 2020, the Plaintiff denied both anxiety and depression and exhibited a normal mental status exam. (ECF No. 8-2, pp. 239-243; ECF No. 8-3, pp. 9-15). And, in January 2021, a depression screen conducted by Dr. Bennett revealed only mild depression with a mildly flattened affect.

Contrary to the Plaintiff's argument, there is nothing to indicate that a consultative mental evaluation should have been ordered. While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted). That is not the case here, as the record contains ample evidence upon which the ALJ could base his decision.

Likewise, we do not find that the evidence before this Court establishes the existence of a severe mental impairment. The Plaintiff failed to seek out professional mental health treatment, reported improvement with medication, and consistently exhibited normal mental status exams. *See Mittlestedt*, 204 F.3d at 852 (holding impairments controllable or amenable to treatment do not support a finding of total disability); *see also Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007)

(holding lack of treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of mental disability).

Accordingly, we find substantial evidence in the record to support the ALJ's finding that the Plaintiff's headaches, episodic kidney stones, and depression/anxiety were not severe impairments.

## B.     RFC Determination

The Plaintiff also insists that the ALJ's RFC determination is not supported by substantial evidence, as it fails to account for all his limitations. We disagree. After reviewing the evidence of record, the ALJ properly concluded the Plaintiff could perform light work, with occasional climbing, balancing, stooping, kneeling, crouching, and crawling.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. The ALJ's RFC determination must be based on all relevant evidence in the record, including medical records, observations of treating physicians and others, limitations resulting from factors such as pain, and the claimant's own descriptions of her limitations. *Id*. § 404.1545(a)(3); *see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) and *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). In assessing RFC, the ALJ must consider limitations resulting from all an individual's impairments, even those found to be non-severe. *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, (S.S.A. 1996) 1996 WL 37418, *5. Although a non-severe impairment, standing alone, may not significantly limit an individual's ability to do basic work activities, when considered with other impairments, it may well be critical to the outcome of the case. *Id*.

The Plaintiff disputes the ALJ's treatment of the evidence concerning his back impairment, insisting that said evidence clearly establishes his inability to perform the exertional requirements

10

of light work. We note that the ALJ properly found his back impairment to be severe. In August 2018, the Plaintiff complained of worsening sciatic pain, starting in the right buttock, and radiating down into his right leg with associated numbness and tingling and occasional weakness. (ECF No. 8-1, pp. 79-83, 132-135, 355-358). An exam revealed tenderness, pain, and spasms in his right lower back. Accordingly, Advanced Practice Registered Nurse ("APRN") Sherilyn Bennett prescribed Mobic, Flexeril, Norco, and a Medrol Dosepak, referred him to physical therapy ("PT"), and recommended stretching exercises and heat. His first PT sessions occurred in September, which he tolerated well. (ECF No. 8-1, pp. 351-352).

On September 25, Dr. Nathan Bennett treated the Plaintiff for persistent pain, numbness, and tingling in the right side of his lower back that radiated into his right leg. (ECF No. 8-1, pp. 117-213, 217, 246-253, 345-349; ECF No. 8-2, pp. 60-61, 181, 542, 547). His pain was aggravated by lifting heavy objects at work, sitting, and standing and improved by lying down and moving around. Lumbar x-rays showed mild disk space narrowing at the L5-S1 level, prompting Dr. Bennett to prescribe Robaxin and recommend continued PT.

Three days later, he returned to Nurse Bennett reporting significant deterioration in his symptoms following a recent automobile accident. (ECF No. 8-1, pp. 136-139, 343-345). Neither physical therapy nor medication was particularly helpful in controlling his pain. On exam, the Plaintiff exhibited a decreased range of motion ("ROM") and tenderness in his lumbar spine. Nurse Bennett prescribed Tylenol #3 and a TENS unit. An MRI ultimately showed a moderate disc protrusion at the L5-S1 level with an extruded fragment compressing the right S1 nerve root and thecal sac. (ECF No. 8-1, pp. 56-57, 118, 213, 216; ECF No. 8-2, pp. 59-60, 180, 528-529).

Although he exhibited a normal gait, the Plaintiff's symptoms persisted. (ECF No. 8-1, pp. 140-145, 339-341). Nurse Bennett referred him to a neurosurgeon in October. And, on

November 5, 2018, Dr. Jack Zigler at the Texas Back Institute evaluated the Plaintiff.  (ECF No. 8-1, pp. 84-90).  An exam revealed at least moderately positive straight leg raise ("SLR") tests bilaterally; tenderness in the right buttock, worse with extension and right lateral bending; referred pain in the lower back with resisted knee flexion and extension; decreased sensation in the L5 distribution on the right; hip esthesia in the S1 distribution; and absent Achilles tendon reflexes on the right.  X-rays documented straightening and a 20 percent decrease in anticipated height at the L5-S1 level.  L5-S1 level spot films also suggested a 30 to 40 percent decrease in height at the L5-S1 level with retrolisthesis.  A single intramuscular steroid injection administered two weeks prior offered no improvement, so Dr. Zigler recommended transforaminal lumbar epidural steroid injections ("LESIs") at the L5-S1 level.  He also advised the Plaintiff to avoid bending, stooping, or lifting more than five pounds.

On October 25, 2018, the Plaintiff reported continued pain and radiculopathy with numbness in his toes.  (ECF No. 8-1, pp. 75-78, 145-149, 335-338).  His wife was concerned because he could not sit or stand for prolonged periods, rendering him unable to work.  The Plaintiff was on short-term disability, and Nurse Bennett extended his disability period and advised that he change positions frequently and not lift over five pounds.

When he returned to the Texas Back Institute in early November 2018, Dr. Blake Staub assessed him, noting conservative treatment had been ineffective.  (ECF No. 8-1, pp. 93-96, 101-103, 205-207).  The Plaintiff appeared uncomfortable, had trouble getting into a fully upright position when arising from a sitting position, and exhibited a painful ROM in his lumbar spine, a positive SLR test on the right, and sensory and reflex abnormalities on the right side.  Dr. Staub opined that imaging had showed a large disk herniation at the L5-S1 level compressing the right nerve root, which was consistent with his symptoms.  He recommended a microdiscectomy at the

L5-S1 level with excision of the epidural mass, which he performed on November 16, 2018. (ECF No. 8-1, pp. 98-100, 180-188, 201). Although the Plaintiff reported some initial improvement in the numbness in his toes, his lower back pain persisted. (ECF No. 8-1, pp. 154-155, 331-333). This prompted Nurse Bennett to extend his disability for another month and to restrict him to no lifting over eight pounds, twisting, or bending.

On December 3, 2018, Dr. Staub prescribed a course of Medrol to treat any residual inflammation, as he had persistent pain in his right leg, absent ankle reflexes on the right, and abnormal dermatome sensation at the L5 level. (ECF No. 8-1, pp. 198-200). Despite taking no prescription pain medication, the Plaintiff was noted to be in no acute distress.

Approximately two weeks later, he reported an improvement in his condition. (ECF No. 8-1, pp. 158-161, 324-326). Nurse Bennett noted a decreased ROM in his lumbar spine and minimal tenderness to palpation at the L5-S1 level, for which she recommended Ibuprofen and a muscle relaxer, apply heat, and use a back brace as needed. Thereafter, he reported continued improvement in his pain. And exams conducted by Dr. Bennett and APRN April Revis in May and October 2019, respectively, were unremarkable. (ECF No. 8-1, pp. 221-228, 238-243, 255-265, 275-280, 308-311, 316-320; ECF No. 8-2, pp. 35-36, 156, 405, 414).

In January 2020, APRN Elizabeth Charles treated the Plaintiff at River Valley Primary Care. (ECF No. 8-1, pp. 281-295, 301-308; ECF No. 8-3, pp. 31-43). In addition to following-up on his diabetes, hypertension, and hypothyroidism, he reported numbness in both feet and severe back pain with radiculopathy. He indicated, however, that the numbness was not severe and did not impact his ability to walk. And an exam revealed a normal ROM with no deficits in strength or sensation. Three days later, Nurse Charles completed a medical source statement indicating the Plaintiff could sit for 4 hours at a time for a total of 8 hours; stand for 4 hours at a time for a total

of 4 hours; and walk for 4 hours at one time for a total of 6 hours; would need 5 extra breaks during the day for 25-45 minutes, and a sit/stand option; could occasionally lift and carry up to 5 pounds, push/pull, work in an extended position, grasp with the right hand, balance, and climb ramps; could not use his left lower extremity for operating leg or foot controls; and could only infrequently perform other postural maneuvers. (ECF No. 8, pp. 266-269; ECF No. 8-1, pp. 528-531). Further, he had marked restriction working near unprotected heights and being exposed to extremes and sudden or frequent changes in temperature or humidity and respiratory irritants. She indicated that Plaintiff's limitations were due to headaches, diabetic neuropathy, and a ruptured lumbar disc with radiculopathy.

Physical exams in November and December 2020 revealed no abnormalities, despite Plaintiff's diagnosis of peripheral neuropathy. (ECF No. 8-2, pp. 1-11, 239-243, 260-264; ECF No. 8-3, pp. 9-29).

No further treatment for back related impairment was sought out until January 8, 2021, the day after the administrative hearing. (ECF No. 8-2, p. 719; ECF No. 8-3, pp. 1-8). Dr. Bennett noted that the Plaintiff had been taking Ibuprofen and/or Tylenol daily because he could not tolerate Hydrocodone. Once again, he exhibited a normal musculoskeletal ROM with lumbar tenderness and decreased sensation in the feet and lower legs but normal muscle tone and coordination. Dr. Bennett noted classic bone changes and some joint overgrowth and tenderness compatible with generalized osteoarthritis and DDD of cervical and lumbar spine, indicating the Plaintiff was unable to return to work and that his health was not likely to improve in the future.

As noted by the ALJ, the inconsistency between Plaintiff's reports of disabling back pain and radicular symptoms and his treatment for said pain, the largely normal results of his examinations, the conservative nature of the treatment prescribed during the relevant period, and

the Plaintiff's use of over-the-counter pain medications suggest that he may have been overstating the amount of pain he was experiencing. *See Pierce v. Kijakazi*, 22 F.4th 769, 772 (8th Cir. 2022) (RFC is determined by considering all relevant evidence). We find that the ALJ adequately accounted for the Plaintiff's post-surgical residual symptoms by limiting him to a restricted range of light work with postural limitations. Additional functional limitations are simply not borne out by the record.

The Plaintiff also alleges that the ALJ ignored his chronic fatigue, which he contends resulted from a variety of sources, including diabetes, thyroid imbalance, and medication side effects. Our review of the record, however, reveals no consistent reports of either fatigue or medication side effects. In fact, at times, he specifically denied experiencing fatigue.

Next, he maintains that his depression and anxiety were not properly considered by the ALJ. As previously discussed, though, the record clearly indicates that the Plaintiff's depression was treated conservatively and effectively via medication prescribed by his primary care physician with consistently normal mental status examinations. Therefore, the record does not support mental restrictions.

Plaintiff argues the ALJ improperly dismissed the assessments of Nurse Charles and Dr. Bennett. However, the ALJ evaluated the supportability and consistency of Nurse Charles' opinions and found them to be unpersuasive. He properly considered the fact that Nurse Charles had only examined the Plaintiff on one occasion prior to rendering her opinion. *See* 20 C.F.R. § 404.1520c(c)(3) (under the applicable regulations, the ALJ may consider a medical source's relationship with a claimant including the length and frequency of treatment). And the ALJ observed that Nurse Charles assessed the Plaintiff with severe and marked limitations in numerous areas of psychological functioning, and moderate limitations in virtually every other area of

15

functioning but noted these limitations were not supported by either her own mental status examination findings or those of other examiners. Under the appliable regulations, an ALJ may find a medical opinion less persuasive when it is unsupported by the provider's own notes. *See* 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."). Similarly, Nurse Charles's physical RFC assessment did not correlate with the limitations she assessed. Rather, her treatment notes document a normal ROM with only subjective tenderness pain over his lumbar spine and radicular symptoms in his right leg. Nurse Charles found no deficits in sensation or strength. *See id.* And, as previously discussed, the examinations of other treatment providers also fail to lend support to her assessment.

The Plaintiff also takes issue with the ALJ's reliance on the opinions of the non-examining agency physicians. However, an ALJ may properly find the state agency medical sources highly persuasive, although they did not actually examine a claimant. Agency physicians are reliable because they "are familiar with the disability evaluation process and its requirements." *See Bowers v. Kijakazi*, 40 F.4th 872, 875-76 (8th Cir. 2022).

In the present case, Dr. Kevin Santulli reviewed the record on April 8, 2020, and concluded the Plaintiff's mental impairments were not severe. (ECF No. 8, pp. 81-82). That same day, Dr. Kristin Jarrad concluded the Plaintiff could perform a full range of light work. (ECF No. 8, pp. 83-84).

On May 5, 2020, Dr. Christal Janssen reviewed the record on reconsideration, noting the objective findings were unremarkable and that the Plaintiff's mental impairments had responded to the medication prescribed by his primary care physician. (ECF No. 8, pp. 93-94). Accordingly,

she affirmed Dr. Santulli's assessment.  Dr. Jim Takach also reviewed the Plaintiff's medical records on May 5, 2020.  (ECF No. 8, pp. 95-97).  He concluded the Plaintiff could perform light work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling.

Thus, while some evidence in the record could lend support to a more restrictive RFC finding, we cannot say that the ALJ's decision "lies outside the available zone of choice."  *See Nash v. Comm' r of Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) ("This court defers to the ALJ's determinations 'as long as good reasons and substantial evidence support the ALJ's evaluation[.]'") (quoting *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)).

We also find no merit in the Plaintiff's argument that the ALJ failed to properly evaluate his subjective complaints.  The ALJ is required to consider all the evidence relating to Plaintiff's subject complaints, including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5), functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them.  *Id*.  However, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances."  *Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted).

As discussed above, the ALJ offered multiple reasons for concluding Plaintiff's subjective complaints were not entirely consistent with the record.  The Plaintiff's own reports of his activities of daily living lend further support to the ALJ's findings.  The Plaintiff indicated he could care for his cat and his personal hygiene, prepare simple meals daily, do laundry, wash dishes, go outside daily, drive, go out alone, shop in stores weekly, handle his finances, fish, and attend church.  (ECF

No. 8, pp. 209-216). We find these activities to be consistent with the ability to perform light work with postural limitations. *See Bryant v. Colvin*, 861 F.3d 779, 783 (8th Cir. 2017) (deferring to ALJ's credibility determination if it is supported by good reasons and substantial evidence). There is also no evidence of medication side effects that would further limit his ability to perform work-related activities. As such, the undersigned finds substantial evidence to support the ALJ's RFC determination.

### C.   Step Four

In his final argument, the Plaintiff disagrees with the ALJ's step four determination that he can return to his PRW. Plaintiff's argument is predicated on the fact that the ALJ's RFC determination is flawed, which we have concluded has no merit. And we note that testimony from a vocational expert based upon a properly phrased hypothetical question constitutes substantial evidence supporting the ALJ's decision. *See Milam v. Colvin*, 794 F.3d 978, 985-86 (8th Cir. 2015).

A review of the transcript shows that the ALJ's hypothetical question properly included only those functional limitations that were well supported by the record and included in the ALJ's RFC determination. Therefore, we conclude that the ALJ properly relied on the testimony of the vocational expert to determine that Plaintiff could perform his past relevant work in addition to other jobs existing in significant numbers in the national economy.

### IV.   Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed, and that the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely**

**objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 12th day of July 2023.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE